

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

INTERNATIONAL RECTIFIER
CORPORATION,

                  Plaintiff,

   vs.

SAMSUNG SEMICONDUCTOR,
INC., et al.,

                  Defendants.

Case No. CV 98-00433 R

[~~PROPOSED~~] INTERIM FINDINGS OF
FACT AND CONCLUSIONS OF LAW
RE CONTEMPT

OSC Hearing
Date:       March 19, 2001

Further Hearing
Date:       May 18, 2001
Courtroom:   8

     This Court issued an order to show cause ("OSC") dated February 15, 2001 ordering defendants' Samsung Semiconductor, Inc. and Samsung Electronics Co., Ltd. (collectively, "Samsung") and non-party IXYS Corporation ("IXYS") to show cause why Samsung and IXYS should not be found in contempt of this Court's permanent injunction order embodied in the Judgment entered January 8, 1999. Plaintiff International Rectifier Corporation ("IR"), Samsung and IXYS filed written declarations, exhibits and arguments prior to the OSC hearing on March 19 and 20, 2001. IXYS CEO Dr. Nathan Zommer and IXYS Operations Manager Kevin McDonough testified, and exhibits were admitted into evidence, at the OSC hearing. IR, Samsung and IXYS then submitted post-hearing briefs and other materials, and on May 18, 2001 this Court heard arguments of counsel, including their responses to questions from this Court, and received further evidence. After giving the evidence the weight it is due, evaluating the credibility of the witnesses, and

considering the arguments and admissions of counsel and the relevant legal authorities, this Court makes the following Interim Findings of Fact and Conclusions of Law:

I.     The **IR v. Samsung** Action and Judgment.

1.     This is an action under the patent laws of the United States, 35 U.S.C. §1 *et seq*. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1338(a).  (First Amended Complaint, ¶1; Answer to First Amended Complaint ("Answer"), ¶1; Stay Order and Judgment, entered January 8, 1999, ¶2).

2.     IR commenced this action on January 16, 1998 by filing a complaint against Samsung which, *inter alia*, accused Samsung of infringing IR's U.S. Patent No. 4,959,699 (the "'699 patent").  (First Amended Complaint).

3.     On June 2, 1998, this Court granted IR's motion for preliminary injunction asserting that Samsung's part number SGL60N90D infringed Claims 19 and 22 of the '699 patent and on June 3, 1998 entered a preliminary injunction order enjoining Samsung (a) "from making, using, selling or offering for sale in, or from importing into, the United States Samsung part number SGL60N90D" and (b) "from making or offering for sale or use in, or for importation into, the United States of Samsung part number SGL60N90D." (Preliminary Injunction Order, entered June 2, 1998, ¶¶1, 2).

4.     On December 22, 1998, this Court granted IR's motion for preliminary injunction asserting that Samsung's planar power MOSFET and SenseFET products infringed Claim 1 of the '699 patent and entered a preliminary injunction order enjoining Samsung "and/or those persons in active concert or participation with [Samsung] who received actual notice of this order . . . from making, using, selling or offering for sale in, or by importing into, the United States any Samsung planar power

MOSFET or SenseFET product." (Preliminary Injunction Order, entered December 22, 1998, ¶1).

5. IR and Samsung then settled this action with a Settlement Agreement dated as of December 30, 1998. (Notice of Confidential Settlement Agreement, lodged January 4, 1999). A Stay Order and Judgment ("Judgment") was entered by the Court on January 8, 1999.

6. The Judgment established that the "['699 patent] (including all proposed amended claims of said patent now pending in reexamination) is valid and enforceable." (Judgment, ¶3). The proposed amended claims of the '699 patent then pending in reexamination were identical to those issuing on January 19, 1999 in Reexamination Certificate No. B2 4,959,699 (Compare IR's Pre-Hearing Exh.U with IR's Pre-Hearing Exh.V).

7. The Judgment further precluded Samsung from contesting that its commercial planar power MOSFETs and SenseFETS as of December 21, 1998 infringed claim 1 of the '699 patent (including as amended in reexamination), except that Samsung retained the ability to contest infringement by such products made on a foundry basis for IXYS: "[Samsung] shall not contest that all commercial planar power MOSFETs and SenseFETs of [Samsung] as of December 21, 1998 (except for those power MOSFETs and SenseFETs, if any, made by [Samsung] for [IXYS] on a foundry basis by a design specified by [IXYS]) infringe claim 1 of [the '699 patent] (including proposed amended claim 1 now pending in reexamination)." (Judgment, ¶3).[1]

---

[1]There is no question that both Samsung and IXYS were aware of which devices and were not subject to the exception from Samsung's admission of infringement. As discussed below, Samsung had been making the devices subject to the exception for and delivering them to IXYS. The Court notes that there is an error in the transcript of (or the Court misspoke during) the May 18,

8.      The design of the devices made by Samsung on a foundry basis for IXYS was not before the Court prior to the Judgment.  IR had requested information relating to those designs, by document request to Samsung and by subpoena to IXYS, but no such information was produced to IR prior to the Judgment.  (Supplemental Declaration of Glenn W. Trost, March 12, 2001, ¶¶5-7 and exhibits referenced therein).  Since the devices Samsung made for IXYS on a foundry basis were not before the Court prior to the Judgment, the Judgment did not prohibit Samsung from later contesting infringement as to those products, should that issue ever arise in the future.  Nothing in the Judgment, however, exempted those foundry products from the scope of the preliminary or permanent injunctions.

9.      The Judgment stayed the Court's June 3, 1998 and December 21, 1998 preliminary injunction orders until no later than May 1, 1999 (Judgment, ¶4), with those preliminary injunction orders again becoming effective on the expiration of the stay. (Judgment, ¶5).

10.     Under the Judgment, the preliminary injunctions were later superseded by "a permanent injunction prohibiting [Samsung] from making, using, offering for sale or selling in or importing into the United States components, devices or products infringing any claim of [the '699 patent]." (Judgment, ¶5).

11.     IR and Samsung waived findings of fact and conclusions of law and all rights to appeal from the Judgment. (Judgment, ¶8).

---

2001 hearing.  The transcript of the Court's comments reads: "Well, I don't see anything that could be less clear than what is set forth there except the number of the parts for which Samsung was providing their MOSFETs or SenseFETs." (Transcript, May 18, 2001, p.52:13-16).  It is clear from the context of the Court's comments that the transcript should read "more clear," not "less clear."

## II.      These Contempt Proceedings.

12.     The Court has the power to "punish by fine or imprisonment, at its discretion, such contempt of its authority . . . as . . . (3) Disobedience or resistance to its lawful writ, process, order, rule, decree or command." 18 U.S.C. §401.  A contempt proceeding in the context of an injunction against patent infringement, "while primarily for the benefit of the patent owner, nevertheless, involves also the concept of an affront to the court for failure to obey its order." <u>KSM Fastening Systems, Inc. v. H.A. Jones Co., Inc.</u>, 776 F.2d 1522, 1524 (Fed.Cir. 1985).

13.     When examining violations of orders and judgments enjoining infringement of a patent, the Federal Circuit has described a bifurcated analysis in which the District Court first determines the procedural question of whether the issues are appropriate for resolution by summary contempt proceedings, and only then turns to the substantive question of whether an infringement has been established:

> Before entering a finding of contempt of an injunction in a patent infringement case, a district court must address two separate questions.  The first is whether a contempt hearing is an appropriate forum in which to determine whether a redesigned device infringes, or whether the issue of infringement should be resolved in a separate infringement action. . . .  If contempt proceedings are appropriate, the second question the district court must resolve is whether the new accused device infringes the claims of the patent.

<u>Additive Controls & Measurement Systems, Inc. v. Flowdata Inc.</u>, 154 F.3d 1345, 1349 (Fed.Cir. 1998).  <u>See also</u>, <u>KSM Fastening Systems</u>, 776 F.2d at 1525.

14.     The procedural question of whether it is appropriate to proceed by contempt proceedings "turns on a comparison between the infringing product and the redesigned device.  If the differences are such that 'substantial open issues' of

-5-

infringement are raised by the new device, then contempt proceedings are inappropriate." Additive Controls, 154 F.3d at 1349.  Moreover, new issues not bearing on infringement do not make contempt proceedings inappropriate:

> The presence of a new issue, however – even a new issue of claim construction – does not necessarily require that a separate infringement action be brought to determine whether the accused device infringes the patent in suit.  Contempt proceedings are appropriate so long as the new issue does not raise a substantial question of infringement.

Additive Controls, 154 F.3d at 1350.

15.    While making interim findings and conclusions, this Court is deferring any findings or conclusions on the "substantial open issues" and infringement questions.  Any such findings and/or conclusions will be taken up again when and if appropriate to do so.

## III.    The Injunction Orders Were Clear and Unambiguous.

16.    Patent injunctions "are frequently drafted or approved by the courts in general terms, broadly enjoining 'further infringement' of the 'patent,' despite the language of Rule 65(d), and Supreme Court interpretation."  KSM Fastening Systems, 776 F.2d at 1526.  This is acceptable because "[t]he unreasonableness of a decree incorporating a vague or broad prohibition against 'infringement' of a 'patent' is alleviated [by] the universal rule [] that contempt proceedings, civil or criminal, are available only with respect to devices previously admitted or adjudged to infringe, and to other devices which are no more than colorably different therefrom and which are clearly infringements of the patent."  KSM Fastening Systems, 776 F.2d at 1526.  On that basis the Federal Circuit concluded, "we believe it is preferable to allow the district

courts wide latitude in framing the injunctions." <u>KSM Fastening Systems</u>, 776 F.2d at 1527.

17.     IR and Samsung waived their right to appeal from the Judgment and also waived findings of fact and conclusions of law. (Judgment, ¶8). They were entitled to do so. <u>Education Testing Services v. Katzman</u>, 793 F.2d 533, 537 (3d Cir. 1986); <u>see also</u> <u>United States v. Oncology Assoc., P.C.</u>, 198 F.3d 489, 501 (4th Cir. 1999).

18.     The Judgment states the reasons for its entry: "This Order and Judgment is entered in accordance with and in recognition of the Settlement Agreement and is intended to facilitate implementation of the Settlement Agreement." (Judgment, ¶1). The incorporated and referenced Settlement Agreement sets forth even more detailed reasons for the injunction. (Notice of Confidential Settlement Agreement, lodged January 4, 1999).

19.     There is no prohibition in Fed. R. Civ. P. 65(d) on the reasons for an order being incorporated in part from or contained in a separate document. In accordance with Fed. R. Civ. P. 65(d) and Federal Circuit precedent, the Judgment describes "in reasonable detail, and not by reference to the complaint or other document, *the act or acts sought to be restrained*" (emphasis added). With regard to the permanent injunction, the Judgment states "a permanent injunction prohibiting [Samsung] from making, using, offering for sale or selling in or importing into the United States components, devices or products infringing any claim of [the '699 patent][.]" (Judgment, ¶5). The language of the permanent injunction is straightforward and unambiguous. It contains no exceptions.

20.     The devices Samsung makes for IXYS are not excepted from the scope of the injunction. While the Judgment preserved Samsung's ability to argue in these

1    contempt proceedings that certain devices it makes for IXYS do not infringe claim
2    1 of the '699 patent (Judgment, ¶3; see also Finding 8 above), the injunction itself
3    contains no exceptions.   An injunction against patent infringement "prohibits
4    infringement by any product, not just those involved in the original suit." Smith Int'l,
5    Inc. v. Hughes Tool Co., 718 F.2d 1573, 1581 n.8 (Fed.Cir. 1983).  The permanent
6    injunction is clear and unambiguous.

IV.   **Samsung's and IXYS' Conduct Following the Judgment.**

21.   In January 1999, at the time of the entry of the Judgment, Samsung had a 15-year
      history of manufacturing MOSFET wafers for IXYS and shipping them to an IXYS
      facility in Santa Clara, California.  (Transcript, p.14:1-8; Trost Decl., February 10,
      2001, Exh.E (Wafer Foundry Agreement), ¶7.2).

22.   Samsung knew very well in 1999 that it could not after May 1 of that year ship
      wafers to IXYS as required by the long-standing Samsung/IXYS foundry agreement.
      On January 21, 1999, Samsung General Manager O.H. Kwan wrote to Dr. Zommer
      and, after quoting the operative language from the preliminary injunction, told him
      that the permanent injunction would reinstate that preliminary injunction as of May
      1, 1999. (Trost Decl., February 10, 2001, Exh.I).  Mr. Kwan concluded that, because:

> Samsung cannot risk a possible contempt citation for
> violating the court's Order by shipping any product
> covered by the language of the injunction into the
> United States . . . , starting on May 1, 1999, Samsung
> will cease further deliveries of wafer products to
> IXYS in the United States.

(Trost Decl., February 10, 2001, Exh.I; see also, Trost Decl., February 10, 2001,
Exh.M (April 26, 1999 letter from Samsung's counsel), p.2 ("because the existence
of an injunction order, a decision by Samsung to proceed with the foundry

1      arrangement could just as likely (if not more likely) trigger a contempt proceeding

2      as a new lawsuit")).

3

4      23.    When faced with an injunction preventing Samsung from delivering MOSFETs to

5             IXYS as required by the foundry agreement, IXYS reacted with "outrage" and

6             insisted that the wafer supply agreement continue to be honored:

7

8                          I was outraged that I have a vice president from
                           Samsung sending me a letter telling me that they
9                          might interpret it or consider it that they will stop
                           shipment. I have a contract with Samsung, and we
10                         talked to Samsung legal counsel, and they said that the
                           whole issue is Samsung/IR. That's all. [¶] So my
11                         answer was along those lines. You have a contract;
                           you're obligated by the contract, and you can ship the
12                         wafers as such until we get notice that we are a party
                           to this problem.
13

14             (Transcript, p.31:22 – p.32:6).

15

16     24.    IXYS sought to maintain "business as usual" even though the injunction prohibited

17             Samsung from continuing to ship infringing wafers to IXYS in Santa Clara. (Trost

18             Decl., February 10, 2001, Exh.J ("To IXYS it is business as usual"); Trost Decl.,

19             February 10, 2001, Exh.K ("there seems to be a confusion among the working groups

20             at Samsung on whether or not business as usual can continue with IXYS").

21

22     25.    After several weeks of discussions, an IXYS executive wrote to Samsung and

23             acknowledged IXYS' agreement to take delivery of the wafers manufactured by

24             Samsung outside of the United States [] to accommodate Samsung's "legal

25             problems" with IR:

26

27                         Samsung also attempted to include its legal problems
                           with International Rectifier (IR) as a topic for
28                         discussion. We strongly felt, and still do feel, that

                                              - 9 -

1

2

3

4

> whatever issues Samsung had with IR is not germane
> to our discussions; however, in order to expedite the
> Settlement Agreement, we relented and thereupon
> agreed that we would accept and take title to the wafer
> shipments under the Wafer Supply Agreement (WFA)
> outside the USA.

5        (Trost Decl., February 10, 2001, Exh.N, p.79).[2]

6

7      26.    Samsung made MOSFETs for IXYS after the stay of the preliminary injunction

8           became effective.  (Transcript, p.85:2-12; Trost Decl., February 10, 2001, Exh.D

9           (IXYS Prospectus dated October 24, 2000, p.31) ("Samsung Electronics' Facility in

10         Kiheung, South Korea is our principal external foundry"); Transcript, p.93:19 -

11         p.95:23 and Exhibit 13 (confirming that Exhibit 13 documents the shipment of

12         MOSFET wafers using the "8X" cell from Samsung to IXYS).

13

14     27.    Samsung shipped those MOSFETs to IXYS in Germany, and IXYS promptly shipped

15          approximately 90% of those devices to its Santa Clara, California, facility.

16         (Transcript, p.85:2 - p.86:6) ("roughly 90%" of the Samsung wafers are shipped to

17         California after "making a short stop in Germany").

18

19     28.    Prior to the injunction, Samsung shipped the wafers it made for IXYS directly to

20         IXYS' facility in Santa Clara, via San Francisco. (Transcript, p.14:1-8; Trost Decl.,

21         February 10, 2001, Exh.E (Wafer Foundry Agreement), ¶7.2).  After May 1, 1999,

22         Samsung knew that at least some of the MOSFET wafers it was shipping would be

23         shipped to Santa Clara for further processing. (Transcript, p.98:11 - p.101:3 (IXYS

24         and Samsung conducted a "joint investigation" in October 1999 to determine whether

25         the problem of back metal peeling off the wafers was caused at Samsung or in Santa

26

---

27        [2]IXYS also agreed to provide an opinion of non-infringement.  Although Dr. Zommer
confirmed that opinion was in fact prepared, it was never sent to Samsung, and IXYS to this day

28   asserts that it is protected by the attorney client privilege. (Transcript, p.89:3-25).

1    Clara and determined that the problem was in fact caused by IXYS in Santa Clara);

2    (Exhs.10, 11).  Although the declarations submitted before the hearing by Samsung

3    were vague about the extent of Samsung's knowledge (e.g., M.S. Kim Decl.,

4    February 27, 2001, ¶3 (further processing on the Samsung wafers is done by "IXYS,

5    IXYS GmbH or one of their vendors (Samsung does not know which)"),[3] Samsung's

6    counsel confirmed in response to a question from the bench that Samsung knew that

7    at least some MOSFET wafers it manufactured for IXYS after the entry of the

8    injunction were in fact being shipped to Santa Clara.  (Transcript, May 18, 2001,

9    p.65:3 - p.66:1).

10

11   29.   For these reasons, the Court finds that Samsung and IXYS sought to maintain what

12         IXYS described as "business as usual" by agreeing that (a) Samsung would ship the

13         MOSFET wafers to Germany and (b) IXYS would ship them to Santa Clara.

14

15   **V.   Samsung and IXYS Had an Agreement And Attempted to Subvert the Application of the Injunction.**

16

17   30.   Based on the totality of the evidence and reasonable inferences therefrom, the Court

18         concludes that there was an agreement between Samsung and IXYS for IXYS to

19         import MOSFET wafers into the United States, which importation had been done

20         directly by Samsung for 15 years prior to the injunction.  Further, this Court

21         concludes that Samsung and IXYS attempted to subvert the application of the

22         injunction by the conduct of sending the parts to outside of the United States and then

23         of sending them into the United States through another process other than through

24         Samsung.

25

26         [3]See also Samsung Post-Hearing Brief, p.11:21-24 ("while there is some conflict in the

27   evidence as to what percentage of the SEC-manufactured devices IXYS GmbH eventually ships to

     California, the undisputed evidence is that Samsung neither knows that percentage, nor has any input

28   or control over what happens to the devices once they are received by IXYS GmbH in Germany.")

31.     Samsung argues at length that it cannot be held in contempt because IXYS, and not Samsung, actually imports the devices at issue into the United States. (Samsung's Post-Hearing Brief, pp.1-8).   However, Samsung cannot accomplish indirectly through IXYS that which Samsung is prohibited by the injunction from doing directly.  "[D]efendants may not nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceedings."  Regal Knitwear Co. v. NLRB, 324 U.S. 9, 14, 65 S.Ct. 478, 480 (1945); see also Waffenschmidt v. MacKay, 763 F.2d 711, 717 (5th Cir. 1985). "An instigator of contemptuous conduct may not 'absolve himself of contempt liability by leaving the physical performance of the forbidden act to others." Roe v. Operation Rescue, 54 F.3d 133, 139 (3d Cir. 1995). Likewise, a party is in contempt of an injunction – even though it does not commit a prohibited act directly – when it acts in concert with a non-party who commits the prohibited act. Roe, 54 F.3d at 137.  Samsung and IXYS entered into an agreement and attempted to subvert the application of the injunction, and Samsung cannot escape liability for the acts of IXYS carried out pursuant to their agreement.

## VI.     IXYS Is Bound by the Injunction.

32.     The Judgment containing the injunction was described to IXYS by Samsung in January 1999 and was discussed by Samsung and IXYS at the time. (Trost Decl., February 10, 2001, Exhs.I-N). The operative language of the preliminary injunction (effective starting May 1, 1999) was quoted to IXYS in January 1999. Dr. Zommer confirmed at the OSC hearing that IXYS obtained an opinion of counsel regarding the infringement of the Samsung MOSFETs being made for IXYS. (Transcript, p.89:3-25).  A draft agreement that the parties discussed at the time provided that the wafer supply arrangements between IXYS and Samsung would terminate if IXYS' "counsel is unable to provide a satisfactory opinion of non-infringement." (Trost

Decl., February 10, 2001, Exh.M, p.88, ¶4.1).  Although that opinion was withheld by IXYS under a claim of attorney-client privilege, the Court concludes that it was created only after a complete investigation by IXYS and/or counsel of all facts potentially relevant to the opinion, including any potentially relevant provisions of the Judgment.[4]

33.   "Non-parties may be held in contempt . . . if they 'either abet the defendant or are legally identified with him.'"  Additive Controls, 154 F.3d at 1355 (paraphrasing marks omitted); see also, Peterson v. Highland Music, Inc., 140 F.3d 1313, 1323-24 (9th Cir. 1998) (same); In re Public Service Co., 848 F.Supp. 318, 327 (D.R.I. 1994) ("[f]or contempt purposes, it is immaterial whether a nonparty who aids and abets a party in violating an injunction is, himself, bound by the factual or legal determinations made in the action pursuant to which the injunction is issued.  Rather, the pertinent inquiry is whether the nonparty knowingly played a material role in violating it); Fed. R. Civ. P. 65(d) (injunction orders are binding on parties and "upon those persons in active concert and participation with them who receive actual notice of the order by personal service or otherwise"); Fed. R. Civ. P. 71 ("when obedience to an order may be lawfully enforced against a person and who is not a party, that person is liable to the same process for enforcing obedience to the order as if a party").

34.   When faced with an injunction preventing Samsung from delivering MOSFETs, IXYS reacted with "outrage" and insisted that the wafer supply agreement continue to be honored:

_____

[4]In addition, there is no dispute that the Judgment itself was provided to IXYS' counsel in late 2000 and again on January 9, 2001.  (Trost Supp. Decl., March 12, 2001, ¶¶2, 3, Exh.T).

I was outraged that I have a vice president from Samsung sending me a letter telling me that they might interpret it or consider it that they will stop shipment. I have a contract with Samsung, and we talked to Samsung legal counsel, and they said that the whole issue is Samsung/IR. That's all. [¶] So my answer was along those lines. You have a contract; you're obligated by the contract, and you can ship the wafers as such until we get notice that we are a party to this problem.

(Transcript, p.31:22 - p.32:6).

35.  Under the foregoing authorities, there is no legal requirement that IXYS be made "a party to this problem" before it is subject to an injunction. Once it received actual notice of the injunction, IXYS was itself subject to contempt for acting pursuant to its agreement with Samsung on a joint course of conduct to effectuate Samsung's contempt, if any (in this case, by importing Samsung's infringing MOSFETs into the United States). Roe, 54 F.3d at 140 (non-parties committing acts prohibited by injunction liable for contempt when acting in concert with parties not directly committing prohibited acts); cf., Gemco LatinoAmerica, Inc. v. Seiko Time Corp., 61 F.3d 94, 99 (1st Cir. 1995) (third-party bank found in contempt as aider or abettor when it participated in "determin[ing] the corporate strategy of the parties in order to avoid the scrutiny of the courts").

36.  IXYS argues that it could not have been acting in concert with Samsung because it was acting on its own interests. Those two interests are not inconsistent; indeed, here they largely overlap. IXYS wanted to buy wafers from Samsung, just as it had always done, and Samsung wanted to continue to sell those wafers to IXYS. When the injunction presented an obstacle to those joint objectives, they entered into an agreement and attempted to subvert the application of the injunction. That is precisely the sort of joint conduct Fed. R. Civ. P. 65(d) and the other authorities place within the Court's contempt power.

- 14 -

## VII. The Settlement Agreement Between IR and Samsung Does Not Prospectively Release IXYS.

37. IXYS – but not Samsung – seeks to construe the Settlement Agreement between IR and Samsung as a license in favor of third parties for acts of infringement occurring on or after May 1, 1999 – the very period during which Samsung's infringement is enjoined. IXYS' interpretation of the contractual language is not permitted under applicable rules of contract interpretation and enforcement.

38. Where the parties to a contract disagree on the meaning of the words within that contract, interpretation of that language is a question of law appropriate for summary judgment or summary adjudication. Tzung v. State Farm Fire & Cas. Co., 873 F.2d 1338, 1341 (9th Cir. 1989).

39. California law controls the interpretation of the Settlement Agreement. (Settlement Agreement, ¶9.1); Brae Transp., Inc. v. Coopers & Lybrand, 790 F.2d 1439, 1443 (9th Cir. 1986).

40. The Court must interpret a contract so as to give effect to the mutual intent of the contracting parties, as it existed at the time of contracting. Cal. Civ. Code §1636. To do this the Court reads the instrument as a whole, looks to objective manifestations of the parties' interpretation of the contract and, if possible, gives effect to all parts of the contract so that none are mere surplusage. Foster-Gardner, Inc. v. National Union Fire Ins. Co., 18 Cal.4th 857, 868 (1998); Winograd v. American Broadcasting Co., 68 Cal.App.4th 624, 632 (1998); Cal. Civ. Code §1641; City of El Cajon v. El Cajon Police Officer's Ass'n, 49 Cal.App.4th 64, 71 (1996).

41. An objective indication of the intent of the contracting parties is the plain meaning of the language of the contract itself. Foster-Gardner, Inc. v. National Union Fire Ins.

Co., 18 Cal.4th at 868.

42. Another objective indication of intent that is afforded great weight are the actions of the contracting parties after signing the contract but before the present controversy began. Winograd v. American Broadcasting Co., 68 Cal.App.4th at 636; So. Pac. Transp. Co. v. Santa Fe Pac. Pipelines, Inc., 74 Cal.App.4th 1232, 1242 (1999).

43. Interpretations offered by non-parties to the contract will not prevail over the parties' interpretation absent fraud or collision. Meadows v. Lee, 175 Cal.App.3d 475, 483-84 (1985).

44. By Paragraph 4.3 of the Settlement Agreement IR released Samsung from any claims for patent infringement based on infringing acts occurring on or before the December 30, 1998 Effective Date[5] of that Agreement: "[IR] releases . . . SAMSUNG from any and all claims . . . which [IR] has at any time prior to the EFFECTIVE DATE owned or held against SAMSUNG." (Settlement Agreement, ¶4.3).

45. By Paragraph 4.5 of the Settlement Agreement IR released Samsung's customers from any claims for patent infringement based on infringing acts occurring on or before the December 30, 1998 Effective Date of that Agreement: "[IR] releases . . . direct and indirect customers of SAMSUNG PRODUCTS, including foundry products made by SAMSUNG for third parties, from any and all claims . . . which [IR] has at any time prior to the EFFECTIVE DATE, owned or held against such persons or entities for infringement of patents owned prior to the EFFECTIVE DATE by [IR], but only with respect to SAMSUNG PRODUCTS and processes used to

---

[5]The Settlement Agreement defines "Effective Date" as "the date first written above as the effective date of this Agreement," which is December 30, 1998. (Settlement Agreement, ¶1.1, p.1, first full paragraph).

make the same." (Settlement Agreement, ¶4.5).

46.    Paragraphs 4.3 and 4.5 refer to claims "owned" (past tense) or "held" (past tense) as of December 30, 1998. Other provisions of the Settlement Agreement grant a license to Samsung to use the patents before the end of the "Term" on May 1, 1999 (Settlement Agreement, ¶¶2, 4, 1), and consent to a Judgment enjoining infringement on and after May 1, 1999 (Settlement Agreement, ¶5.1 and form of Judgment attached as Exh.A thereto, ¶¶4,5). Paragraphs 4.3 and 4.5 cannot be interpreted to include a release for infringing acts occurring after the Effective Date.

47.    Paragraph 4.1 contains a consent or license of infringing acts by Samsung or its customers occurring after the Effective Date and prior to May 1, 1999 Defined to be the "Term"[6]): "[IR] shall not charge any SAMSUNG PRODUCT . . . with infringement occurring before or during the TERM [and] this paragraph shall apply not only to SAMSUNG, but also to direct and indirect . . . customers of SAMSUNG PRODUCTS, including foundry products made by SAMSUNG for third parties." (Settlement Agreement, ¶4.1).

48.    Paragraph 4.7 of the Settlement Agreement contains the customary waiver of rights under Cal. Civ. Code §1542 (which otherwise would prevent a release from extending to unknown claims), and emphasizes that Paragraphs 4.1, 4.3 and 4.5 will apply to both known and unknown claims existing prior to December 30, 1998 Effective Date, even if not discovered until sometime in the future: "It is the intention of the parties that the release in paragraphs 4.3 through 4.6 shall survive the TERM

---

[6]The Settlement Agreement defines "Term" as follows: "a period starting on the EFFECTIVE DATE [December 30, 1998] and ending on the first to occur of May 1, 1999 or forty-five days after the closing [of the Samsung/Fairchild agreement for purchase of Samsung's Bucheon wafer fabrication facility]." (Settlement Agreement, ¶1.2).

as a bar to all matters released therein . . . notwithstanding the discovery . . . of any additional or different facts or claims existing prior to the EFFECTIVE DATE . . . . [T]his Agreement is intended to cover . . . any facts and/or claims existing prior to the EFFECTIVE DATE and not now known or anticipated, but which may later be discovered. (Settlement Agreement, ¶4.7). Paragraph 4.7 does not purport, cannot be interpreted, to expand the scope of the releases or license of Paragraphs 4.1, 4.3 or 4.5.

49. The language of the Settlement Agreement, including Paragraph 4.7, may only reasonably be read to release or license IR's claims arising from acts of infringement occurring before May 1, 1999. The Settlement Agreement cannot be construed to include releases of claims based on infringing acts occurring on and after May 1, 1999.

50. IXYS relies on Augustine Med., Inc. v. Progressive Dynamics, Inc., 194 F.2d 1367 (Fed.Cir. 1999), for the proposition that the Settlement Agreement should be interpreted to release claims based on infringing acts occurring after the date of the Agreement. (IXYS Brief, March 1, 2001, pp.20-21). Augustine does not support that result.

51. The parties in Augustine were first involved in unfair competition litigation related to warming blankets. They settled that case, and then Augustine brought a second action, alleging that the same blankets at issue in the first case infringed Augustine patents. The settlement agreement did not purport to set forth any license rights or other provisions expressly addressing those patents, and instead provided that Augustine was releasing Progressive from "any and all manner of action that [Augustine] have, have had, or *may have* against [Progressive] upon or by reason of or *relating to any acts*, omissions or statements made *by [Progressive] on or before*

- 18 -

*the date of this Settlement Agreement*." Augustine, 194 F.3d at 1371 (emphasis added). The emphasized portions of this quote indicate the language that the Federal Circuit relied on in concluding that future sales of the warming blanket at issue were within the scope of the release:

> The phrase "may have" is future-oriented. In the context of the Settlement Agreement, it implies a *future possibility* of Augustine having a claim . . . . [¶] Augustine has discharged its ability to use Progressive not for claims that existed on or before the date of the Settlement Agreement, but for claims *related to* any actions taken by Progressive on or before the date of the Settlement Agreement. Prior to and on the date of the Settlement Agreement, as well as after the date of the Settlement Agreement, Progressive was producing and marketing the convective blankets at issue. Augustine's claims for patent infringement then are undeniably *related* to Progressive's [acts] before the date of the Settlement Agreement. While Augustine's claims for patent infringement in the present litigation are not directly *based on* Progressive's actions prior to the date of the Settlement Agreement, they are sufficiently *related* to those pre-settlement actions so as to fall within the clear meaning of the language of the agreement.

Augustine, 194 F.3d at 1371 (emphasis in original).

52. It is significant that the Federal Circuit focused on the use of "may have" in the release, and three times in this holding emphasized the release's use of the word "related to." The Settlement Agreement does not contain those words, or words of similar import – the release provisions refer to claims "owned" (past tense) or "held" (past tense) as of December 30, 1998. Similarly, Paragraph 4.7 refers to the release of claims "existing prior to the EFFECTIVE DATE." There is no suggestion that the released claims can be broadly "related to" Samsung's infringement – the form of judgment attached to and incorporated into the Settlement Agreement makes clear that it is limited to "claims for acts of infringement occurring prior to May 1, 1999."

1   (Settlement Agreement, Exh.A, ¶5).[7]

2

3   53.   A similar issue was addressed in <u>Pearson v. Quickturn Design Systems</u>, 1998 WL

4   34607 (N.D.Cal., Jan.23, 1998). The plaintiff in that case had previously entered into

5   a settlement agreement in which he agreed to "'release[] and discharge[] Quickturn

6   . . . , of and from any and all claims, demands, liabilities or causes of action

7   whatsoever, which Pearson now has or ever had against [Quickturn] whether or not

8   now known, suspected or claimed . . . ." The plaintiff also waived his rights under

9   Cal. Civ. Code §1542, agreeing to a broad waiver of "'all claims or possible claims

10   by the parties, including but not limited to those claims . . . arising out of or related

11   to the Litigation, whether the same are known, unknown, or hereafter discovered or

12   ascertained.'" <u>Pearson</u>, 1998 WL 34607 at *2.  The plaintiff subsequently sued

13   Quickturn for similar conduct occurring after the date of the settlement.  The court

14   found that because the settlement agreement referred only to claims which Pearson

15   "now has" or "ever has had" against Quickturn, it did not contain any prospective

16   application language and so did not bar Pearson's claims arising out of Quickturn's

17   conduct subsequent to the date of the settlement agreement.  <u>Pearson</u>, 1998 WL

18   34607 at *5.

19

20   54.   Similarly, in <u>Redel's Inc. v. General Electric Co.</u>, 498 F.2d 95 (5th Cir. 1974), the

21   plaintiff had previously released the defendant "from all claims, demands, contracts

22   and liabilities, if any there be, as of the date of the execution of this agreement by the

23   Dealer." The court found the agreement's language "as of the date of the execution"

24   unambiguously set forth the parties' intent to release General Electric for past acts

25   only, not prospectively for claims arising after the date the parties signed the

26

27   ─────────────────────

28   [7]The form of judgment also provides that it is "without issue or claim preclusion in favor of
    third parties," such as IXYS. (Settlement Agreement, Exh.A, ¶5).

1    agreement.  Redel's Inc., 498 F.2d at 98-99 (also holding prospective release of

2    antitrust violations are against public policy).

3

4    55.   Like the language in Pearson and Redel's Inc., the Settlement Agreement contains

5          no release language with future tense.  It cannot be read by IXYS to include what it

6          manifestly does not have.  Moreover, interpretations offered by non-parties to the

7          contract will not prevail over the parties' interpretation absent fraud or collusion.

8          Meadows v. Lee, 175 Cal.App.3d 475, 483-84 (1985) (non-party to escrow

9          agreement argued that it had "terminated" [thus activating non-party's option to

10         purchase the house] but parties to the agreement acted as if it had not "terminated,"

11         court adopted parties' interpretation).   The actual parties to the Settlement

12         Agreement, IR and Samsung, plainly never intended or understood that agreement

13         to have the effect now argued by IXYS.

14

15   56.   As discussed above, under the controlling law the infringement issue in this contempt

16         hearing is very narrow – is there any difference, material to the claims of the patent,

17         between the Samsung devices this Court previously adjudged to be infringements

18         (Judgment, ¶3) and the Samsung devices now accused of being infringements.

19

20   57.   "In making a finding that the new accused device is an infringement, . . . it may, in

21         some cases, only be necessary to determine that the modified device has not been

22         changed from the adjudged device in a way which affects an element of a claim.  In

23         such case the new device, though modified, may be treated the same as the device

24         which was admitted or adjudged to infringe." KSM Fastening Systems, Inc. v. H.A.

25         Jones Co., Inc., 776 F.2d 1522, 1528 (Fed.Cir. 1985).  An injunction against patent

26         infringement "prohibits infringement by any product, not just those involved in the

27         original suit."   Smith Int'l, Inc. v Hughes Tool Co., 718 F.2d 1573, 1581 n.8

28         (Fed.Cir. 1983).

58.   The Judgment establishes the validity and enforceability of the '699 patent. (Judgment, ¶3).  Defenses such as patent validity are irrelevant.  <u>Fastening Systems</u>, 776 F.2d at 1529 ("Whether there is infringement may not be challenged in contempt on the basis that the patent is invalid.  The validity of the patent is the law of the case in such proceedings"); <u>Additive Controls</u>, 154 F.3d at 1350.

59.   While the parties have presented evidence on the questions of colorable difference and infringement, IXYS has argued that a ruling on those questions in this contempt proceeding may affect its right to a jury trial on the infringement question in the pending <u>IR v. IXYS</u> case.  In view of that argument, the Court defers making any findings or conclusions on the colorable difference and infringement questions.  Any such findings and/or conclusions will be taken up again when and if appropriate to do so.

This Court makes the preceding interim findings of fact and conclusions of law re: contempt *nunc pro tunc* on June 25, 2001.

Dated:   **3-15-02**

United States District Judge

- 22 -