UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| INTERNATIONAL RECTIFIER CORPORATION, | Case No. CV-98-0433 R |
| PLAINTIFF, | [PROPOSED] ADDITIONAL FINDINGS OF FACT AND CONCLUSIONS OF LAW RE CONTEMPT |
| VS. | |
| SAMSUNG SEMICONDUCTOR, INC., AND SAMSUNG ELECTRONICS CO., LTD. | OSC Hearing: Date:  March 19, 2001 |
| DEFENDANTS. | Further Hearing: Date:  May 18, 2001 Courtroom of The Honorable Manuel L. Real |

The Court hereby makes the following additional findings in connection with its an order to show cause ("OSC") dated February 15, 2001 directing defendants Samsung Semiconductor, Inc. and Samsung Electronics Co., Ltd. (collectively, "Samsung"), and non-party IXYS Corporation ("IXYS") to show cause why Samsung and IXYS should not be found in contempt of this Court's permanent injunction order embodied in the Judgment entered January 8, 1999:

1.     When examining violations of orders and judgments enjoining infringement of a patent, the Federal Circuit has described a bifurcated analysis in which the District

Court first determines the procedural question of whether the issues are appropriate for resolution by summary contempt proceedings, and only then turns to the substantive question of whether an infringement has been established:

> "Before entering a finding of contempt of an injunction in a patent infringement case, a district court must address two separate questions. The first is whether a contempt hearing is an appropriate forum in which to determine whether a redesigned device infringes, or whether the issue of infringement should be resolved in a separate infringement action. . . . . If contempt proceedings are appropriate, the second question the district court must resolve is whether the new accused device infringes the claims of the patent."

Additive Controls & Measurement Systems, Inc. v. Flowdata Inc., 154 F.3d 1345, 1349 (Fed. Cir. 1998). *See also*, KSM Fastening Systems, Inc. v. H.A. Jones Co., Inc., 776 F.2d 1522, 1525 (Fed. Cir. 1985).

2.     The procedural question of whether it is appropriate to proceed by contempt proceedings "turns on a comparison between the original infringing product and the redesigned device. If the differences are such that 'substantial open issues' of infringement are raised by the new device, then contempt proceedings are inappropriate." Additive Controls, 154 F.3d at 1349. Moreover, new issues not bearing on infringement do not make contempt proceedings inappropriate:

> "The presence of a new issue, however — even a new issue of claim construction — does not necessarily require that a separate infringement action be brought to determine whether the accused device infringes the patent in suit. Contempt proceedings are appropriate as long as the new issue does not raise a substantial question of infringement."

Additive Controls, 154 F.3d at 1350.

3.    "In making a finding that the new accused device is an infringement, . . . it may, in some cases, only be necessary to determine that the modified device has not been changed from the adjudged device in a way which affects an element of a claim.  In such case the new device, though modified, may be treated the same as the device which was admitted or adjudged to infringe."  KSM Fastening Systems, 776 F.2d at 1528.  An injunction against patent infringement "prohibits infringement by any product, not just those involved in the original suit."  Smith Int'l, Inc. v. Hughes Tool Co., 718 F.2d 1573, 1581 n.8 (Fed. Cir. 1983).

4.    The Judgment establishes the validity and enforceability of the '699 patent.  (Judgment, ¶ 3.)  Defenses such as patent validity are irrelevant.  KSM Fastening Systems, 776 F.2d at 1529 ("Whether there is infringement may not be challenged in contempt proceedings on the basis that the patent is invalid.  The validity of the patent is the law of the case in such proceedings"); Additive Controls, 154 F.3d at 1350.

5.    The parties have presented evidence on the questions of colorable difference and infringement.  IR has requested that the Court take judicial notice of the order in the IR v. IXYS case that IXYS's infringement of '699 Claim 1 has been established beyond triable controversy (Order Granting International Rectifier's Motion for Summary Adjudication Re IXYS's Infringement of Claim 1 of U.S. Patent No. 4,959,699, entered July 26, 2001 in CV-00-6756-R (the "Infringement Order") and of the order denying IXYS's motion for summary adjudication of non-infringement of the '699 patent (Order Denying IXYS Corporation's Motion for Summary Adjudication Re Non-Infringement and Invalidity of U.S. Patent No. 4,959,699, entered July 26, 2001 in CV-00-6756-R), and this Court hereby grants IR's request for judicial notice of the fact of entry of these orders.

6.    IR also has submitted to the Court in this matter the evidence submitted by IR and IXYS and considered by the Court in connection with the Infringement Order and the

3

order denying IXYS's non-infringement motion.  (Exhibits to Trost 8/17/2001 Decl.)  IR

has moved the admission in this matter of, and the Court has admitted, this evidence of <u>both</u>

parties from the <u>IR v. IXYS</u> case, with the exception of evidence as to which the Court

sustained objections as reflected in the Infringement Order.

7.      A patent infringement analysis involves two steps:  (1) the proper

construction of the asserted claim; and (2) a determination as to whether all of the claim

limitations are present, either literally or by substantial equivalent, in the accused device.

<u>Gart v. Logitech, Inc.</u>, 254 F.3d 1334 (Fed. Cir. 2001).  The first step, claim construction, is

an issue of law for the court.  <u>Markman v. Westview Instrs, Inc.</u>, 52 F.3d 967, 970-71, 976

(Fed. Cir. 1995), <u>en banc</u>, <u>aff'd</u>, 517 U.S. 370 (1996).

8.      The Court construed '699 Claim 1 in this action when granting a preliminary

injunction in December 1998.  In addition, as reflected in the Infringement Order whose

judicial notice has been taken, the Court construed that claim as a matter of law in

connection with the parties' cross-motions on the infringement question in the <u>IR v. IXYS</u>

case.  While those two constructions are consistent with each other, the construction in the

<u>IR v. IXYS</u> case is more detailed, as IXYS raised a number of claim-construction

arguments in that case that Samsung did not raise in opposition to the preliminary

injunction motion in this action.  Again, the issue of claim construction is one of law for the

Court to decide, <u>Markman</u>, 52 F.3d at 970-71, 976, and so the construction of patent claims

should not vary substantively from case to case.  Accordingly, the Court repeats <u>verbatim</u>

below in findings 65 through 100 its claim construction findings 4 through 39 in the

Infringement Order.

*A. Claim Construction*

### 1. Preamble

9.    The preamble to Claim 1 is not necessary to an understanding of the claim elements, which standing alone fully describe a structure that would have been understood by a person of ordinary skill in the power semiconductor art as of 1978. Generally, as is the case here, the preamble does not limit the claims, and thus preamble statements of intended use are not claim limitations. O.I Corp. v. Tekmar Co., 115 F.3d 1576, 1583 (Fed. Cir. 1997); Loctite Corp. v. Century Steps, Inc., 781 F.2d 861, 868 (Fed. Cir. 1985.) In any event, the preamble to Claim 1 is as follows: "A high power metal oxide silicon field effect transistor device exhibiting relatively low on-resistance and relatively high breakdown voltage; said device comprising . . . ." Various examples of such structures are described in the written specification and drawings of the '699 patent. In general, a "metal oxide silicon field effect transistor device" — i.e., a MOSFET — would have been understood to be a device employing an insulated gate electrode to control an invertible channel; in other words, a device, as is described in the claim limitations following the preamble, having an insulated gate electrode that, when activated, would form a channel permitting current to flow between the two power electrodes and that, when the gate was inactive, the device would block the voltage across the power electrodes.

### 2. Limitation 1: wafer having a lightly doped portion

10.    The first element of Claim 1 is as follows:  "a wafer of semiconductor material having first and second opposing semiconductor surfaces; said wafer of semiconductor material having a relatively lightly doped major body portion for receiving junctions and being doped with impurities of one conductivity type." The specification discloses a variety of wafer configurations, each of which has a lightly doped region whose doping level and thickness are determined by the desired reverse voltage of the device:

"An n(-) epitaxial layer is deposited on substrate 20 and will have a thickness and resistivity depending on the desired reverse voltage.  All junctions are formed in this epitaxial layer which can have a relatively high resistivity.  In the embodiment disclosed, the epitaxial layer has a thickness of about 35 microns and a resistivity of about 20 ohm-centimeters.  For a 90 volt device, epitaxial layer 20 would be about 10 microns thick and would have a resistivity of about 2.5 ohm-centimeters."  ('699 patent, col. 3, line 65 - col. 4, line 6.)

11.     The specified wafer would have been understood to have been relatively lightly doped, at least at one surface in order to receive diffusions, with the thickness and doping of the wafer (or of at least the lightly doped portion) selected to ensure that the device could block the desired "off" state voltage without breaking down.  Dr. Shott has opined, without contradiction from IXYS, that this relationship between thickness, doping level and breakdown voltage was well known in the art at the time of the inventions.

### 3.      Limitation 2: at least first and second spaced base regions

12.     The next element of Claim 1 is as follows:  "at least first and second spaced base regions of the opposite conductivity type to said one conductivity type formed in said wafer and extending from said first semiconductor surface to a first depth beneath said first semiconductor surface; the space between said at least first and second base regions defining a vertical common conduction region of one conductivity type at a given first semiconductor surface location; the concentration of carriers of said one conductivity type in said common conduction region at said first semiconductor surface being less than the concentration of carriers of said opposite conductivity type of said first and second base regions at said first semiconductor surface."  In prior litigation involving the '699 patent, the Court concluded that the "common conduction region" of '699 Claim 1 could be defined by an array of polygonal bases.  International Rectifier Corp. v. SGS-Thomson

1  <u>Microelectronics, Inc.</u>, 38 U.S.P.Q.2d 1083, 1085, ¶ 7 (C.D. Cal. 1994), *aff'd without op.*

2  56 F.3d 81 (Fed. Cir. 5/10/95). This element of Claim 1 would have been understood to

3  require a number of separate "base" regions of conductivity type opposite to that of the

4  lightly doped layer (*e.g.*, P type base regions diffused into a lightly doped N type epitaxial

5  layer). The number of base regions is not constrained — it can be arbitrarily large, so long

6  as there are at least two of them. The material of the first conductivity type (*i.e.*, the same

7  conductivity type as the lightly doped major body portion) between these bases is defined

8  in the claim to be the "common conduction region." In addition, because the patent defines

9  the common conduction region to be the region between bases, and further requires that the

10 drain conductive region both be remote from the common conduction region and separated

11 from it by the relatively lightly doped major body portion, those of ordinary skill would

12 have understood that the device current would flow, upon exiting the channel, in a

13 predominantly vertical direction through the common conduction region, and hence that the

14 claims inherently describe a vertical-conduction structure. Because the base regions are

15 diffused into the relatively lightly doped major body portion, the concentration of dopants

16 (carriers) at the top surface of that relatively lightly doped region is inherently less than the

17 concentration of dopants (carriers) at the surface of the bases.

18

19         13.    A number of specific arguments have been directed to this claim limitation.

20

21                (a)     **Enhanced Conductivity**

22

23         14.    IXYS argues that the phrase "common conduction region" should be

24 construed as the region in the epitaxial layer located between the base regions, which is

25 relatively highly conductive/doped compared to the conductivity of the epitaxial layer, and

26 through which current flows between the channels and the drain region; and that the

27 claimed "common conduction region" must be relatively highly conductive (or highly

28 doped) compared to the conductivity of the relatively lightly doped major body portion.

15.     The claim language does not support IXYS's argument that the claimed "common conduction region" must be relatively highly conductive (or highly doped) compared to the conductivity of the relatively lightly doped major body.  Rather, the "common conduction region" is defined in the claim itself as the space between the bases or, put another way, the portion of the "relatively lightly doped major body portion" between the bases.

16.     The doping concentration limitation IXYS would read into all claims is found only in claims IR has *not* asserted against IXYS:  dependent Claims 2, 4 (claim cancelled), 9, 10, 15 and 21 (and claims depending from those claims):  "said common conduction region is relatively highly doped compared to said relatively lightly doped major body portion".  Asserted independent Claims 1 and 7 and dependent claims 3, 6, 8, 11, 12, 16, 17, 19, 20 and 22 through 29 do not include any such language.  Because *unasserted* Claims 2, 9, 10, 15 and 21 — which include the restriction that "said common conduction region is relatively highly doped compared to said relatively lightly doped major body portion" — are dependent claims that add this additional element to the elements of the claims on which they depend, it would be unreasonable to construe the *asserted* independent claims as already containing that limitation.  D.M.I., Inc. v. Deere & Co., 755 F.2d 1570, 1574 (Fed. Cir. 1985).

17.     For example, independent Claim 1 simply recites, in pertinent part: "the space between said at least first and second base regions defining a vertical common conduction region of one conductivity type at a given first surface location."  Dependent Claim 2 adds the additional restriction that "said common conduction region is relatively highly doped compared to said relatively lightly doped major body portion . . . ."  If the "common conduction region" in the device of Claim 1 already was "relatively highly doped compared to said relatively lightly doped major body portion," then Claim 2 would not have recited that language as an added restriction on the "common conduction region" of Claim 1.

8

18.     The Patent Office also recognized that the common conduction region of the independent claims is not required to be relatively highly doped compared to the relatively lightly doped major body portion.  For example, the Patent Office examiner rejected Claim 1 during reexamination on the basis of a hypothetical device he asserted was obvious from the Takakuwa and Okabe references.  Although that hypothetical device did not include a relatively highly doped region between the bases, the examiner nonetheless described it as "a plurality of polygonal base regions surrounded by a common conductive drain region." (Reexam. No. 90/003,490, Paper No. 6, pp. 14-18.)  Throughout the Patent Office proceedings on the '699 patent, IR overcame this and all other rejections of Claim 1, but IR never argued that Claim 1 could be distinguished from the prior art because it requires that the common conduction region be relatively highly doped compared to the relatively lightly doped major body portion.

19.     For these reasons, the "common conduction region" is properly construed as the semiconductor material of the first conductivity type between the bases.  The level of doping/conductivity of the "common conduction region" is not constrained to be higher between the bases than in the underlying "relatively lightly doped major body portion."

### (b)     Spacing

20.     IXYS also asserts that the there is no "common" conduction region between bases where the two bases are far enough apart that they do not experience "significant FET pinch-off."  Again, however, the claim language itself "defines" the "common conduction region" as "the space between said at least first and second base regions" without regard to the spacing between those base regions.  While a person of ordinary skill in the art would understand that the bases preferably would be closely spaced to maintain breakdown voltage, the current from both bases will flow through the "space between" "base regions,"

1    which is "defined" to be the common conduction region — whether or not those bases are

2    close enough to generate "pinch off."

3

4         21.    Similarly, the specification describes current flow from each channel only as

5    flowing through the space between the bases: "Current from each source can flow through

6    its respective channel (after the creation of the inversion layer defining the channel), so that

7    majority carrier conduction current can flow through the bulk region and across the wafer

8    or chip to the drain electrode." ('699 patent, 1:48-53.)  The current from each channel

9    flows through the current path defined by the space between bases (*i.e.*, through the

10   claimed "common conduction region"), whether or not those bases interact to generate

11   "significant FET pinch-off."

12

13        22.    Accordingly, a "common" conduction region is properly construed to refer to

14   the portion of the "relatively lightly doped major body portion" between the bases.  The

15   amount of spacing between the bases is not constrained.

16

17                 **(c)    Admixing**

18

19        23.    IXYS also argues that statements in the '699 file history restrict the word

20   common to a region wherein the current from two or more regions "admix."  IXYS's

21   reading of the prosecution history of the patents is incomplete.  The comment on which it

22   relies was immediately clarified during reexamination to make clear that no literal

23   admixing is required:

24

25             Patentee would like to clarify certain of its remarks . . . filed March

26             24, 1995.  In its remarks distinguishing the claimed invention from devices

27             such as those disclosed, e.g., in the Plummer reissue patent and Scharf et al.

28             and Plummer et al. articles, patentee stated that, in the claimed invention,

current from the channels admixes and flows downwardly through the common conduction region . . . . *Patentee's point is simply that current flow in the common conduction region is predominantly vertical*, whereas current flow in a device [like Plummer's] with a surface drain disposed between the channels is predominantly lateral. *Whether or not there is literal admixing of current in the common region is irrelevant to the invention.*" (Supplemental Response, dated May 19, 1995, emphasis added.)[1]

24.     Consistent with this clarification, the presence or absence of "admixing" of current in the prior art references played no role in the Patent Office's interpretation or allowance of the amended claims. (*See, e.g.*, Reexam. No. 90/003,490, Paper No. 9, pp. 2-3 ("While the lightly doped major body portion (36) [of Plummer] may satisfy the newly claimed concentration relationship, finite vertical portions of the lightly doped major body portion disposed between the bases and common drain cannot meet the presently claimed vertical characterization because, as the Patent Owner explains on amendment page 15, conduction therebetween is horizontal in the main.").)[2]

---

[1] Likewise, IR pointed out during the reexamination of the '699 patent that "In paragraph 4 of footnote 4 of the Supplemental Response [in the '699 reexamination], the Patent Owner pointed out that the 'contributions' of the 'crowded electrical current' from each inversion layer of Lisiak et al. Figure 5, disposed along each wall of the 'V', do not combine until they reach the apex of the 'V' beneath the base. Patent Owner wishes to clarify for the record that this statement is not intended to imply, directly or indirectly, that the claims of the Lidow et al. '725 and/or '699 patents are limited to a structure in which there is admixing of current in the common conduction region. Patent Owner's point is simply that the recitation in the claims of a common conduction region between spaced bases does not and cannot read on a V-groove structure, in which the silicon occupying the space limited by the split portions of the base has been removed." (Supplemental Amendment Pursuant to 37 C.F.R. 1.550(b), served November 22, 1996 in Reexam. Nos. 90/003,490 and 90/003,900.)

[2] IXYS cites to testimony in prior cases by the inventors concerning the supposed requirement for commingling of current in a common region. While an inventor may in testimony explain the invention and its development, inventor testimony as to the meaning of claim language seldom should be considered in construing patent claims. Solomon v. Kimberly-Clark Corp., 216 F.3d 1372, 1379-81 (Fed. Cir. 2000). This is particularly true where, as here, that testimony is argued

25.     Those of ordinary skill would have understood that the current contribution from one '699 base tends to spread laterally as the current flows generally downwardly through the device.  Since this is true of the other '699 spaced bases as well, the lateral components of these currents tend to cancel each other, resulting in a location between two given bases, (which Dr. Zommer referred to as the "zero current line") at which the net lateral current is zero.  In other words, the current component going from left to right exactly matches the current component going from right to left at that point, so the net lateral current component is zero.

26.     Electrons in a device such as a MOSFET move according to two principal phenomena.  One is called "drift," and refers to the tendency of a charged particle such as an electron to move in response to an electric field or voltage.  The other is called "diffusion," and refers to the motion of electrons and other particles according to local thermal conditions.  A "zero current line" does not suggest that exactly zero electrons cross it.  Instead, it suggests that the electric fields are arranged so that the net number of electrons crossing it is zero.  If, for example, random thermal motion caused more electrons to cross the "zero current line" from left to right, that a voltage would be created that would be just sufficient to cause an equal number of electrons to cross from right to left.  In this way, although electrons are moving constantly in all directions due to thermal conditions, a dynamic equilibrium is established so that the net flow across the "zero current line" tends to return quickly to zero.

27.     This phenomenon is present in any MOSFET having two active base regions being held to (more or less) the same potential, such as those depicted in the '699 patent.  When the channels are activated in that structure, the potential of the material near the channel will tend towards the voltage of the source electrode, while the material lower

---

by IXYS to contradict the record of proceedings in the Patent Office.  Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1583 (Fed. Cir. 1996).

12

down in the device will tend towards a higher voltage (in an n-channel device, which voltage will be a function of the device current and on resistance). Under those conditions, there will be a "zero current line" at some point between the bases in the material defined in the claims to be the "common conduction region." Thus, there would be understood to be literal "admixing" of electrons at a "zero current line" in the devices depicted in the '699 patent, and in any other MOSFET device where opposing channels are held at (more or less) the same potential.

28.     For these reasons, the claimed "common conduction region" is properly construed not to require any particular kind of interaction between the current flows emanating from the spaced bases.

### (d)     "The Concentration of Carriers" in the "Common Conduction Region" and in the "Base Regions"

29.     IXYS also contends that this limitation requires that "the concentration of electrons (or holes, if a p-type epitaxial layer) in the common conduction region when measured at all places on the top surface of the semiconductor cannot be greater than the concentration of holes (or electrons, if an n-type base region) in the base region when measured at all places on the top surface of the semiconductor."

30.     This claim language was introduced during reexamination, and was accompanied by the following remarks:

"A further amendment has been proposed for claims 1, 7 and 19 which states that the concentration of the N-type carriers in the common conduction region between bases and at the top surface of the chip is less than the concentration of P-type carriers at the top surface of the chip in the adjacent

13

1  (P-type) bases. This amendment is not new matter, is expressly stated in the

2  specification, and is the inherent consequence of the process used to form the

3  regions shown in Figures 4 and 5. Thus, in Figure 4, N+ regions 63 and 64

4  are implanted into the top of the chip with a dose of $1 \times 10^{12}$ to $1 \times 10^{14}$

5  atoms/cm$^2$ and are then diffused into the chip (col. 5, lines 27-40).

6  Thereafter, and in Fig. 5, P regions 71 and 72 are formed by implantation of

7  boron at a higher dose and in the range of $5 \times 10^{13}$ to $5 \times 10^{14}$, to counterdope

8  the previously formed N regions (or pre-existing N(-) substrate if the N+

9  implant is not used) to form the low concentration, shallow base portion

10  (channel regions 34 and 35 of Fig. 2). Since P regions 71 and 72 are created,

11  the concentration of the P material must be greater than the N concentration

12  in the host region of the chip." (Amendment dated March 24, 1995, p. 12,

13  Reexam. No. 90/003,490.)

14

15  31.  As is plain from the remarks accompanying the amendment, the restriction on

16  carrier concentration is meant to apply to the dopants — i.e., the donor or acceptor atoms

17  that provide carriers. It could not be otherwise. When addressing validity, IXYS's expert

18  confirms that the interpretation advanced by IXYS "makes no sense."

19

20  32.  For example, when the gate is active, the normally p type base "inverts" to

21  become n type in the channel at the surface as that region is depleted of holes and flooded

22  with electrons. The construction proposed by IXYS would have the effect of excluding any

23  device with an invertible channel from the scope of the claims, which would be an

24  unreasonable construction given that the claims are directed to devices having invertible

25  channels. Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1583 (Fed. Cir. 1996) (an

26  interpretation that excludes the preferred embodiment is "rarely, if ever, correct").

27

28

33.     Similarly, as argued by IXYS, the PN junction between the base and the common conduction region is inherently depleted of carriers, which means that all devices will "always" be outside the scope of the claims.  Again, it would be an unreasonable construction to exclude all devices from the scope of the claim.  Id.

34.     For these reasons, this claim element is met when the doping in the common conduction region is the same or even less than that in underlying major body portion.  This restriction also is met when the doping concentration in the common conduction region is higher than that in the underlying major body portion, but less at the surface in the common conduction region than at the surface in the bases.

### 4.     Limitation 3:  source regions

35.     The next element of Claim 1 is as follows:  "first and second source regions of said one conductivity type formed in each pair of said at least first and second base regions respectively at first and second first surface location to a depth less than said first depth; the outer rim of each of said first and second source regions being laterally spaced along said first semiconductor surface from the lateral outer periphery of its said base region to define first and second channel regions along said first semiconductor surface between each pair of said first and second source regions, respectively, and said common conduction region."  Examples of the claimed source regions are the unnumbered N+ regions in contact with source contacts 81 and 82 in Figure 8.  In each example, the edge of the source nearest the common conduction region parallels the edge of the base diffusion to define channels at the top surface and under the gate electrode.  This element of Claim 1 would have been understood to require a region of the same conductivity type as the lightly doped region (N type in these examples) within each base region such that a channel is defined at the top surface under the gate electrode.

### 5.    Limitation 4:  Source electrode

36.    The next element of Claim 1 is as follows:  "source electrode means connected to said source regions."  Again, various examples of this are described in the '699 written specification and drawings, including source electrodes 81 and 82 in Figures 7 and 8.  The specification also notes that "In carrying out the above invention, it should be noted that any type of contact material can be used to make the source and gate contacts.  By way of example, aluminum could be used for the source electrodes . . . ."  ('699 patent, col. 6, lines 59-62.)  This element of Claim 1 is properly construed to embrace any aluminum or other contact to the source regions.

37.    The claims specify that the "common source electrode" or "common source electrode means" must be "connected to" the source regions, but do not constrain the means by which such electrodes are so "connected."  Claim 1 merely requires "source electrode means connected to said source regions."  ('699 patent, col. 7, lines 64-65.)  The claim does not require or preclude any particular structure for "connecting" the source electrode to the annular source.

### 6.    Limitation 5: Gate insulation

38.    The next element of Claim 1 is as follows:  "gate insulation layer means on said first surface, disposed at least on said first and second channel regions."  Again, various examples of this are described in the '699 written specification and drawings, including "gate oxide 88" (Figure 8).  Accordingly, this element of Claim 1 is properly construed to embrace any gate insulation layer.

### 7.   Limitation 6: Gate electrode

39.   The next element of Claim 1 is as follows: "gate electrode means on said gate insulation layer means and overlying said first and second channel regions." Again, various examples of this are described in the '699 written specification and drawings, including "ring-shaped gate 80" in Figures 7 and 8. The specification also notes that the "In carrying out the above invention, it should be noted that any type of contact material can be used to make the source and gate contacts. By way of example, aluminum could be used for the source electrodes while a polysilicon material can be used for the conductive gate 80 in FIG. 8 or the conductive gate 24 in FIG. 2" ('699 patent, col. 6, lines 59-64.) This element of Claim 1 is properly construed to embrace any aluminum, polysilicon or other gate electrode.

### 8.   Limitation 7: drain conductive region

40.   The next element of Claim 1 is as follows: "a drain conductive region remote from said common region and separated therefrom by said relatively lightly doped major body portion." An example of this "further region" is the N+ substrate on which the lightly doped epitaxial layer is formed. (col. 3, lines 64-65.) This claim element is properly construed to include any region carrying a substantial portion of device current that is separated from the common conduction region (between the bases) by the lightly doped layer.

### 9.   Limitation 8: Drain electrode

41.   The next element of Claim 1 is as follows: "a drain electrode coupled to said drain conductive region." For example, in Figure 8 "further region" 83 is "coupled" to the electrode (the unnumbered cross-hatched structure) at the bottom surface of the wafer and top electrode 85 is "coupled" to N+ region 95 and buried layer 84. Similarly, in the Figure

2 embodiment, electrode 26 is "coupled" to the unnumbered substrate layer. This claim element is properly construed to include any electrode electrically coupled to the "drain conductive region." This "coupling" is properly construed to indicate device current flowing through both the drain conductive region and the electrode.

### 10.    Limitation 9: At least one base a polygon

42.    The final element of Claim 1 is as follows: "at least said first base region being a cellular polygonal region; said cellular polygonal region being surrounded by said common conduction region; said first source region having the shape of an annular ring disposed within said cellular polygonal first base region." The example of this structure in the specification is central square base 94 in Figure 8, which has an annular source region disposed within it and is surrounded by a common conduction region.

43.    As defined in the dictionary, a polygon is a closed plane figure bounded by straight lines. The specification describes Figures 7 and 8 as "a planar configuration which is a simple rectangular arrangement." ('699 patent, 6:22-23.) Although called a "rectangular arrangement," the metalization patterns shown in Figure 8 are generally square shapes with rounded corners. Likewise, the underlying base regions within the silicon formed by diffusion through the windows would not be perfectly polygonal, as both experts agree that it is inherent that the polygonal shape used to define the base shape is distorted during the manufacturing process.

44.    For these reasons, this limitation is properly construed to require the base shape, at the surface, to be generally but not perfectly polygonal — *i.e.*, the surface expression of the base will be a closed figure with generally (not necessarily perfectly) straight sides.

B.    *Application of Claim 1 to the MOSFETs Made By Samsung for IXYS*

45.    The power MOSFETs at issue made by Samsung for IXYS have bases shaped like elongated octagons. (Hearing Exs. 2, 7, 15.) These devices have bases arranged in arrays where every other octagon is rotated by 90 degrees.[3]

46.    Samsung and IXYS argue that the "common conduction region" of Claim 1 must be relatively highly conductive. (Samsung Post-Hearing Brief, p. 25; IXYS 3/1/2001 Brief, pp. 8-11, 23; IXYS Post-Hearing Brief, pp. 19-21.) As discussed above, this claim construction argument by Samsung and IXYS is incorrect as a matter of law — the claimed "common conduction region" need not be relatively highly conductive. Moreover, as already noted above, under the controlling law the infringement issue in this contempt proceeding is very narrow: Is there any difference, material to the claims of the patent, between the Samsung devices this Court previously adjudged to be infringements (Judgment, ¶ 3) and the Samsung devices now accused of being infringements? <u>KSM Fastening Systems,</u> 776 F.2d at 1528. With respect to the lack of a relatively highly doped common conduction region, neither Samsung nor IXYS asserts that there is a difference — and there is none — between the Samsung devices adjudicated by the Judgment to infringe Claim 1 and the Samsung devices made for IXYS now before the Court. (Hearing Exs. 12, 301; 2/10/2001 Shott Decl.)

47.    Samsung and IXYS argue that the word "common" in the claim phrase "common conduction region" requires that current from neighboring bases admix in the conduction region between them. (Samsung Post-Hearing Brief, pp. 8-11, 22 n. 5, 23; IXYS 3/1/2001 Brief, p. 23; IXYS Post-Hearing Brief, pp. 14-16, 18-19.) Again, Samsung

---

[3] These same devices were also at issue in the motions considered in the <u>IR v. IXYS</u> case. 5/25/2001 Shott Decl., Exs. M-P; 6/26/2001 Suppl. Shott Decl., Ex. T.

and IXYS are wrong on claim construction as a matter of law.  As explained above, admixing of current in the claimed common conduction region is not required by the claim.

48.     In addition, Dr. Zommer testified that current from neighboring bases meets at the zero current line in the common conduction region <u>both</u> in those Samsung MOSFETs before the Court at the time of the Judgment (<u>e.g.</u>, as illustrated in Ex. 230) and in the Samsung MOSFETs made for IXYS now before the Court (<u>e.g.</u>, as illustrated in Ex. 218). (Hearing Exs. 228, 229).  The only difference in terms of current flow between those two sets of devices testified to by Dr. Zommer would be that the zero current line is in the center of the common conduction region in those Samsung devices previously before the Court while the zero current line is off-center in the common conduction region in the Samsung devices made for IXYS now before the Court.  (<u>Id</u>.)  Any such difference in the position of the zero line between these two sets of devices is not material to the application of the "common conduction region" element of the claim — whether or not construed to require admixing of current in the common conduction region.

49.     Samsung and IXYS argue that the Samsung MOSFETs made for IXYS now before the Court do not meet the "carrier concentration" limitation of Claim 1.  (Samsung 2/28/2001 Brief, p. 23; Samsung Post-Hearing Brief, pp. 16-17; IXYS 3/1/2001 Brief, p. 24; IXYS Post-Hearing Brief, pp. 21-22.)  That argument relies on the construction of "carrier concentration" rejected by the Court above.  Moreover, neither Samsung nor IXYS cite any difference — and there is none — between the Samsung MOSFETs before the Court at the time of the Judgment and the Samsung MOSFETs made for IXYS now before the Court with regard to the application of the "carrier concentration" limitation of Claim 1. (5/18/2001 Materials Referenced in Argument, Tabs 19 (pp. 11-12), 23.)  The non-infringement argument now advanced would have applied equally to the devices adjudicated as infringing in the Judgment and, accordingly, is precluded in these contempt proceedings as a matter of law.  <u>KSM Fastening Systems,</u> 776 F.2d at 1528.

50.    The shape of the source regions in <u>both</u> the Samsung MOSFETs adjudged to infringe Claim 1 by the Judgment and the Samsung MOSFETs made for IXYS now before the Court are the same. (2/10/2001 Shott Decl.; *compare* Hearing Ex. 2 (p. '31) *with* Ex. 301 (p. 101-48); *compare* Hearing Ex. 218 *with* Ex. 230.) In granting a preliminary injunction against Samsung's MOSFETs in December 1998, the Court held that this source shape — characterized by Samsung as a "ladder" shape (Hearing Ex. 12) — satisfied the claim requirement for an "annular" source.[4]  Samsung and IXYS argue that the claim limitation "source electrode means connected to said source regions" is not met in devices where the source annulus is not directly contacted by (<u>i.e.</u>, touching) the source electrode, but instead is connected to the source annulus by another structure -- i.e., the cross-bar of the "ladder" or "figure 8" shaped source in the Samsung MOSFETs made for IXYS now before the Court. (Samsung 2/28/2001 Brief, pp. 22-23; Samsung Post-Hearing Brief, pp18-20; IXYS Post-Hearing Brief, pp. 16-18.)  However, the Court's claim construction above disposes of this argument as a matter of law: "The claims specify that the 'common source electrode' or 'common source electrode means' must be 'connected to' the source regions, but do not constrain the means by which such electrodes are so 'connected.' Claim 1 merely requires 'source electrode means connected to said source regions.' ('699 patent, col., 7, lines 64-65.) The claim does not require or preclude any particular structure for 'connecting' the source electrode to the annular source." The Court also applied this same

---

[4] "Samsung argues only that Claim 1 cannot cover the source pattern in its MOSFETs, which it characterizes as a 'ladder' shape and not the shape of an annular ring, as required by Claim 1. (Opposition, pp. 10-12.) Dr. Shott has opined, however, based on his examination of Samsung's accused devices and the documents describing their design, that '[a]ll of Samsung's planar power MOSFETs and SenseFets employ polygonal bases having an annular source region spaced from their outer peripheries to define a channel. The annular source also has an added bar across the middle to ensure good contact to the source metal.' (Shott Decl., ¶ 41.) While this 'added bar' does arguably give the sources the appearance of a 'ladder,' the Court is persuaded that Dr. Shott is correct and that the addition of the 'bar' does not detract from Samsung's use of sources in the shape of an annular ring. Moreover, '[t]he addition of features does not avoid infringement, if all elements of the patent claims have been adopted.' <u>Northern Telecom., Inc. v. Datapoint Corp.</u>, 908 F.2d 931, 945 (Fed. Cir. 1990)." (Findings of Fact and Conclusions of Law Re Preliminary Injunction Order, filed 12/31/1998, Ex. B to 2/10/2001 Trost Decl., pp. 11-12.) Because there is no difference in source shape between the Samsung MOSFETs adjudged by the Judgment to satisfy the claim requirement of an "annular source" and the MOSFETs now before the Court, that issue cannot be relitigated in these contempt proceedings. <u>KSM Fastening Systems,</u> 776 F.2d at 1528.

21

claim construction in issuing a preliminary injunction against Samsung MOSFETs in 1998.[5] Any difference in the means of source connection between Samsung MOSFETs previously adjudged infringements and the Samsung MOSFETs made for IXYS now before the Court is not material to the application of the properly construed "source connection" limitation of Claim 1.

51.     Samsung and IXYS argue that the base regions in the Samsung MOSFETs made for IXYS now before the Court do not meet the "cellular polygonal" requirement of Claim 1 because — according to Samsung and IXYS — the bases in those MOSFETs have rounded corners or are "peanut" shaped. (Samsung Post-Hearing Brief, pp.23-24; IXYS Post-Hearing Brief, pp. 22-23.) As discussed above, the Court has construed the applicable limitation of Claim 1 to require bases that are "generally but not perfectly polygonal" in shape. (Order, p. 17.) The actual shape of the bases in the MOSFETs at issue is within this claim scope. (Hearing Ex. 15.) There is no dispute that the base regions both in the Samsung MOSFETs adjudged as infringements by the Judgment and in the MOSFETs made by Samsung for IXYS now before the Court are made by diffusion thorough openings that have the shape of elongated octagons (Hearing Exs. 2, 7, 301 (p. 101-48)) and that the octagonal shape of those diffused base regions will become more rounded as a result of diffusion. The resulting generally octagonal shape of the base regions is visible in a photograph relied on by IXYS's expert as representative of IXYS's MOSFETs. (Hearing Ex. 15)

---

[5] "Claim 1 does not constrain the method by which the source region is contacted. Claim 1 merely requires 'source electrode means connected to said source regions.' ('699 patent, col. 7, lines 64-65, emphasis added.) The claim does not require or preclude any particular structure for 'connecting' the source electrode to the annular source. That Samsung has chosen to accomplish this element, at least in part, with a bar-shaped region in conjunction with the annular source does not take its products outside the scope of Claim 1. In any event, the evidence showed that there was direct contact between the source electrode and the annular portion of the source." (Findings of Fact and Conclusions of Law Re Preliminary Injunction Order, filed 12/31/1998, Ex. B to 2/10/2001 Trost Decl., p. 12 n. 3.)

52.    Samsung, but not IXYS, argues that Claim 1 reads only on a pair of base regions where the first base in the pair is polygonal in shape and the second base in the pair encircles the first base. (Samsung 2/28/2001 Brief, pp. 24-25; Samsung Post-Hearing Brief, p. 25.) This argument is wrong as a matter of law based on the Court's claim construction above. Moreover, Samsung's non-infringement argument in this regard would apply equally <u>both</u> to the Samsung MOSFETs adjudged as infringements by the Judgment and to the Samsung MOSFETs made for IXYS now before the Court. Accordingly, Samsung's argument is precluded in these contempt proceedings. <u>KSM Fastening Systems</u>, 776 F.2d at 1528.

53.    Finally, Samsung and IXYS seek to rely on the reverse doctrine of equivalents in an attempt to avoid infringement. (Samsung 2/28/2001 Brief, p. 25; Samsung Post-Hearing Brief, p. 24; 2/28/2001 Gwozdz Dec., Ex. 2, pp. 29-30.) The reverse doctrine of equivalents is rarely sufficient to defeat infringement — "it is well established law that this doctrine applies only in the rarest of cases." <u>New England Medical Center Hospitals, Inc. v. PeproTech, Inc.</u>, 1994 WL 613021 at *3-4 (D. N.J. 1994). *See also* <u>Caterpillar Tractor Co. v. Berco, S.p.A.</u>, 714 F.2d 1110, 1115 n.3 (Fed. Cir. 1983) ("It is possible, of course, for a claim to be literally but not actually infringed, where for example, a claim may 'read on' a structure having no relation to the invention. Instances are rare.") Application of the doctrine presumes that the Samsung MOSFETs made for IXYS literally infringe the asserted patent claim. <u>Martin v. Barber</u>, 755 F.2d 1564, 1565 n.1 (Fed. Cir. 1985). Samsung and IXYS bear the burden to show that the MOSFETs Samsung makes for IXYS have been "so far changed in principle that they perform the same or similar function [as IR's patented inventions] in a substantially different way." <u>Smithkline Diagnostics, Inc. v. Helena Laboratories Corp.</u>, 859 F.2d 878, 889 (Fed. Cir. 1988) (quoting <u>SRI Int'l v. Matsushita Elec. Corp.</u>, 775 F.2d 1107, 1123-24 (Fed. Cir. 1985)).

54.     Samsung's attempt to invoke the reverse doctrine of equivalents is accompanied by no substantive argument or evidence.  (Samsung 2/28/2001 Brief, p. 25; Samsung Post-Hearing Brief, p. 24.)  IXYS substantive discussion appears in an exhibit to the declaration of its expert Dr. Gwozdz.  (Gwozdz Dec., Ex. 2, pp. 29-30.)  IXYS makes two arguments:  (a) that in the MOSFETs Samsung makes for IXYS, features other than the deeper portions of their base profiles are responsible for high breakdown voltage; and (b) that IXYS achieves low on-resistance in its devices by maintaining large spaces between its bases rather than by closely spacing, or increasing the conductivity between, the bases.  (Id.)

55.     The application that led to the '699 patent contained a number of inventions, including (a) the use of enhanced conductivity between spaced bases, which is the general subject matter of U.S. Patent No. 4,376,286; (b) the use of bases having a head-and-shoulders profile, which is the general subject matter of U.S. Patent No. 4,642,666; (c) a process useful for making MOSFETs having bases with a head-and-shoulders profile, which is the general subject matter of U.S. Patent No. 4,705,759; and (d) various new and useful MOSFET structures, including the structure described in Claim 1 of the '699 patent.  That new and useful structure generally involves the use of at least two bases to define a common conduction region, with at least one of those bases having the shape of a polygon and being surrounded by the common conduction region.  The other inventions disclosed in that original application — enhanced conductivity, head-and-shoulders base profile, method of manufacture, etc. — are not part of the invention claimed by '699 Claim 1, when that claim is properly construed.

56.     There are no substantial open issues of infringement raised concerning the MOSFETs made by Samsung for IXYS and now at issue.  Those MOSFETs are not different from the Samsung MOSFETs adjudged as infringements by the Judgment in any way which affects an element of Claim 1 of the '699 patent.  Each and every element of

1   Claim 1 reads literally on those MOSFETs, and the reverse doctrine of equivalents is of no

2   help to Samsung and IXYS here.

3

4

5   Dated:   Dec. 11, 2002                              _____
                                                              United States District Judge
6

7   Submitted by:

8   GLENN W. TROST (State Bar No. 116203)
    COUDERT BROTHERS
9   333 South Hope Street, 23rd Floor
    Los Angeles, California 90071
10  tel: (213) 229-2900
    fax: (213) 229-2999
11
    WILLEM SCHUURMAN
12  DAVID E. KILLOUGH (State Bar No. 110719)
    VINSON & ELKINS L.L.P.
13  The Terrace 7
    2801 Via Fortuna, Suite 100
14  Austin, TX 78746
    Tel:  (512) 542-8428
15  Fax:  (512) 236-3253

16
    _____
17              Glenn W. Trost
    Attorneys for Plaintiff International
18  Rectifier Corporation

19

20

21

22

23

24

25

26

27

28

# **PROOF OF SERVICE**

I am employed in the County of Los Angeles, State of California, I am over the age of 18 and not a party to the within action; my business address is 333 South Hope Street, Los Angeles, California 90071.

On November 25, 2002, I served the foregoing document(s) described as

[AMENDED PROPOSED] INTERIM FINDINGS OF FACT AND CONCLUSIONS OF LAW RE CONTEMPT

on the interested parties in this action, at the following addresses:

Maxwell M Blecher, Esq.
Blecher & Collins
611 West 6th Street #2000
Los Angeles, CA 90017

Roger L. Cook, Esq.
Townsend & Townsend & Crew LLP
Two Embarcadero Center, 8th Floor
San Francisco, CA 94111

Michael G. Schwartz, Esq.
Gray Cary Ware & Freidenrich LLP
3340 Hillview Avenue
Palo Alto, California 94304

( )   (For Collection).  By placing a true copy (copies) thereof enclosed in a sealed envelope(s), addressed as above, and by placing said sealed envelope(s) for collection and mailing on that date following ordinary business practices.  I am "readily familiar" with the business' practice for collection and processing of correspondence for mailing the U.S. Postal Service.  Under that practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Los Angeles, California, in the ordinary course of business.

(X)   (Overnight Delivery).  By placing a true copy(ies) thereof enclosed in a sealed envelope(s) or package(s) as designated by Federal Express, addressed as above, and depositing said envelope(s) or package(s), with delivery fees provided for, in a box regularly maintained by Federal Express at 333 South hope Street, Los Angeles, California 90071.

(X)   (Courtesy copy via Facsimile).  By transmitting a true copy(ies) thereof to each of the designated counsel on the service list to their facsimile numbers as listed below.

( )   (Personal Delivery). I caused to be served by messenger for personal delivery that same day the foregoing documents in a sealed envelope to the above persons at the address(es) listed above.

(X)   I declare under the penalty of perjury that the foregoing is true and correct.

Executed on November 25, 2002, at Los Angeles, California.